# Supreme Court of Florida

_____

No. SC12-132
_____

**STATE OF FLORIDA,**
Appellant,

vs.

**THOMAS D. WOODEL,**
Appellee.

_____

No. SC12-132
_____

**THOMAS D. WOODEL,**
Cross-Appellant,

vs.

**STATE OF FLORIDA,**
Cross-Appellee.

[June 5, 2014]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

This case is before us on the State's appeal from an order granting a new

penalty phase based on the defendant's motion to vacate a sentence of death under

Florida Rule of Criminal Procedure 3.851 and the defendant's cross-appeal from the trial court's order denying a new trial as to both the guilt and penalty phases. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons addressed in this opinion, we reverse the trial court's order granting a new penalty phase, affirm the trial court's order denying an entirely new trial, and reinstate the defendant's sentence of death.

## I. BACKGROUND

Thomas D. Woodel was convicted in Polk County, Florida, for the first-degree murders of Clifford and Bernice Moody, an elderly married couple, who he cut and stabbed. Woodel, who was twenty-six years old on the date of the crimes, was also convicted of burglary and robbery in the same case. The pertinent facts pertaining to Woodel's convictions are addressed in our decision issued in his first direct appeal:

> Clifford Moody, who was seventy-nine years old, and his seventy-four year old wife, Bernice, lived in a mobile home trailer on lot 533 at Outdoor Resorts of America in Polk County. The Moodys owned another trailer on adjoining lot 532, which they sometimes rented. Bernice was seen by the newspaper delivery man cleaning lot 532 about 4:30 to 4:45 a.m. on December 31, 1996. Clifford was last seen by a security person at the Outdoor Resorts Laundromat at about 5:30 a.m. The Moodys were preparing to show the mobile home for rental that day.
> The Moodys were found dead a little after 1 p.m. on December 31, 1996. Clifford was found lying on his back in the dining room area of the trailer on lot 532. His underwear and pants had been pulled down to below his knees. His eyeglasses lay approximately two feet from his head. Dr. Alexander Melamud, the medical

examiner, testified that Clifford received a total of eight stab wounds, causing more internal than external bleeding, and that he died as a result of these stab wounds close in time to his wife's death.

Bernice was found in the same trailer with multiple stab wounds. She lay dead on a bed in the back of the trailer and was nude except for one sock. A nightgown and female underwear with a knot tied in it lay on the floor next to the bed. Additionally, pieces of a porcelain toilet tank lid were found underneath her. Dr. Melamud testified that Bernice incurred a total of fifty-six cut or stab wounds, many of which on her right arm he opined to be defensive. Her jugular vein had been slit. Additionally, she had received significant blunt trauma injuries to her head, and her nasal bones were fractured. Dr. Melamud testified that Bernice died as a result of her injuries sometime in the early morning hours of December 31, 1996. No semen was detected on Bernice.

With the permission and assistance of Outdoor Resorts, detectives searched the park's dumpsters the morning of January 3, 1997. The dumpsters had not been emptied since prior to December 31, 1996. During the search, detectives found three garbage bags containing pieces of a porcelain toilet tank lid, a wallet containing Clifford's identification and credit cards, keys with a tag stating "Cliff's keys," glasses, bloody socks, paperwork with the address of lot 301, and paperwork bearing the names of the defendant and his son, Christopher Woodel.

That afternoon, detectives went to lot 301. Woodel lived there with his long-time girlfriend, Christina Stogner, and his sister, Bobbi Woodel. Woodel and his sister signed consent forms to have their trailer searched. Stogner was out of town at that time. Also present that day at lot 301 was Gayle Woodel. Although not known at that time, it would later be discovered that Gayle married Woodel in 1989, and they had a son together, Christopher. Gayle and Woodel separated in 1992 but never divorced. In 1996, Gayle and Christopher lived in North Carolina while Woodel lived in Florida. However, Gayle had just come to Florida from North Carolina so that Christopher could spend some time with Woodel. Gayle, Christopher, and two of Gayle's friends were staying at Woodel's trailer.

While some detectives searched the premises, Woodel agreed to be questioned by other detectives. As Woodel left with the detectives, Woodel went over to Gayle and whispered for her to get rid of the knife Woodel had hidden. Gayle told Woodel's landlady and friend

about the content of the communication. Gayle later told deputies as well.

The detectives gave Woodel <u>Miranda</u> warnings, and he consented to talk with them. He initially told the detectives that he had been home asleep at the time of the murders. After further questioning, Woodel began to write out a statement. He then stopped and confessed to killing the Moodys, whom he said he had never met. The detectives then tape-recorded Woodel's confession. In this taped confession played for the jury, Woodel admitted to drinking with others that evening after work in the lot next to the Pizza Hut where he worked. Afterwards, Woodel walked to Outdoor Resorts, a little over a mile from the Pizza Hut. Woodel admitted to entering the Moody's rental trailer early in the morning after seeing Bernice through the window. He said he went in to ask for the time. According to Woodel, Bernice was alone in the trailer. Upon seeing him, she came at him with a knife, over which Woodel soon gained control. He then proceeded to stab her many times and hit her over the head with a porcelain toilet tank lid one to three times. The toilet lid shattered.

Clifford was last seen doing laundry at the Laundromat by security guard Elmer Schultz between 5:30 and 5:40 a.m. In his confession, Woodel said that he was leaving the trailer when Clifford came inside. Woodel then stabbed Clifford. As Clifford lay on the floor, Woodel picked up a bucket and placed pieces of the shattered toilet tank lid in it. He also placed the knife along with several other items in the bucket. Woodel said that after stabbing Clifford, he took Clifford's wallet.

Woodel also said in his confession that he threw some items into a canal in the mobile home park, threw some items away in his garbage, and hid the knife behind a dresser. Deputies would later find pieces of the toilet tank lid and Bernice's eyeglasses in the canal, and a knife in Woodel's room wedged between a wall and the dresser.

<u>Woodel v. State</u> (<u>Woodel I</u>), 804 So. 2d 316, 319-20 (Fla. 2001).

The jury voted twelve to zero for Mrs. Moody, and nine to three for Mr.

Moody in recommending that Woodel be sentenced to death. <u>Id.</u> at 320. The trial

court found the same aggravators[1] and mitigators[2] for both murders.  Id.  The trial court accepted the jury's recommendations and imposed sentences of death for both murders.  Id.  On direct appeal, Woodel raised three guilt phase issues[3] and

---

1.  We previously stated:

In aggravation, the trial court found that: (1) the defendant had previously been convicted of another capital offense; (2) the killings were perpetrated while the defendant was engaged in a burglary; (3) the killings were especially heinous, atrocious, or cruel (HAC); and (4) the victims were particularly vulnerable due to advanced age or disability.  The trial court specifically rejected that Clifford's murder occurred as a result of Woodel's effort to escape and avoid being arrested.

Id. at 320-21 (footnotes omitted).

2.  Similarly, we also stated:

The trial court found the statutory mitigator that Woodel had no significant history of criminal activity.  The trial court also found seven nonstatutory mitigators: (1) Woodel was physically abused as a child; (2) he was neglected by his mother; (3) there was instability in his residences as a child; (4) both of Woodel's parents were deaf and mute; (5) use of alcohol and drugs; (6) Woodel was willing to meet with the victim's family prior to trial; and (7) he was willing to be tested for a possible bone marrow donation for his daughter, who had leukemia.  The trial court specifically rejected a finding that Woodel was so intoxicated that he could not form the intent to kill.

Id. at 321.

3.  Woodel raised the following guilt phase issues:

Woodel argue[d] that: (1) his motions for judgment of acquittal should have been granted by the trial court regarding premeditation, robbery, and burglary; (2) the trial court impermissibly allowed constructive amendment of the indictment; and (3) his mistrial motion

- 5 -

three sentencing phase issues.[4]  Id. at 321.  We affirmed the convictions, but vacated the sentences of death because the sentencing order failed to assign weights to the aggravating and mitigating circumstances.  Id. at 327.  The case was remanded with instructions "to reconsider the sentence."  Id.

However, when the case returned to the circuit court in 2001, the original trial judge was unavailable to reconsider the sentence.  Therefore, Woodel was granted a new penalty phase with a successor judge presiding.  Woodel v. State (Woodel II), 985 So. 2d 524, 527 (Fla. 2008).  At the conclusion of the second penalty phase, held in 2004, the jury recommended a life sentence for the murder of Mr. Moody, and recommended by a vote of seven to five that the sentence of death be imposed for the murder of Mrs. Moody.  Id.  After holding a Spencer hearing,[5] the sentencing court followed the jury's recommendations, and imposed

_____

should have been granted because the State made an impermissible reference to a marital communication in its opening statement.

Id. at 321 n.7.

4.  Woodel raised the following sentencing phase issues:

Woodel argue[d] that: (1) the trial court committed reversible error for rushing the penalty phase; (2) the trial court erred in finding the burglary and advanced age aggravators; and (3) the trial court erred in evaluating the mitigation evidence.

Id. at 321 n.8.

5.  Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 6 -

the sentence of death only for the murder of Mrs. Moody.  Id.  The sentencing

court found the same four aggravators that were found in Woodel's initial trial;[6]

however, it found four statutory mitigators[7] and ten nonstatutory mitigators.[8]  Id.

On direct appeal, Woodel raised six claims.[9]  Id. at 527-28.  We determined that

---

6.  The sentencing court found four aggravating circumstances (prior violent felony conviction; committed during commission of a burglary; especially heinous, atrocious or cruel (HAC); and victim vulnerability due to age or disability).  Woodel II, 985 So. 2d at 527.

7.  The sentencing court found "four statutory mitigators (no significant criminal history; defendant's age; substantial impairment of capacity to appreciate his actions or conform his conduct to the requirements of law; and extreme emotional disturbance)."  Id.

8.  The sentencing court further found

> ten nonstatutory mitigators (physical abuse as a child; neglect and rejection by his mother and others; an unstable home as [a] child; parents who were deaf and spoke primarily in sign language; abuse of alcohol and drugs; willingness to meet with the victims' daughter; willingness to be tested for bone marrow donation for his daughter; the defendant's belief in God; his voluntary confession; and the defendant's compassion for others).

Id.

9.  Woodel's claims on direct appeal consisted of the following:

> (1) the trial court erred in excusing for cause two jurors who were not sufficiently fluent in the English language without the aid of an interpreter; (2) fundamental error occurred when the jury heard and considered prejudicial testimony from a State witness; (3) the trial court erred in finding the aggravating factor of "vulnerability due to advanced age or disability" with regard to the murder of Bernice Moody; (4) Woodel's sentence of death is not proportional; (5) Woodel is entitled to a life sentence because Florida's death penalty

- 7 -

the sentence of death imposed on Woodel was proportionate to other cases in which the death penalty was imposed. Therefore, we affirmed Woodel's sentence of death. Id. at 532-34.

## II. POSTCONVICTION PROCEDURAL HISTORY

In April 2010, Woodel filed a motion in the Circuit Court of the Tenth Judicial Circuit in and for Polk County, pursuant to rule 3.851, in which he sought postconviction relief. A second successor judge presided over the postconviction proceedings due to the unavailability of the circuit judge that presided over Woodel's second penalty phase in 2004.

The postconviction court ruled that an evidentiary hearing was necessary to address Woodel's allegations of ineffective assistance of counsel. The evidentiary hearing was held in 2011 over nine nonconsecutive days. Woodel presented twenty-seven witnesses, including his former trial attorneys, expert witnesses, and other witnesses. No witnesses appeared for the State.

Woodel presented seven general claims for postconviction relief. In four of his claims, Woodel alleged that he was deprived of his constitutional right to

---

law violates his right to due process, and his right to trial by a jury; and (6) execution by lethal injection constitutes cruel and unusual punishment.

Id. at 527-28.

- 8 -

reliable adversarial testing due to ineffective assistance of counsel.[10] Woodel sought a new guilt phase under Claim I, which consisted of four subclaims. He also sought a new penalty phase under Claim II, which consisted of seven subclaims. After the evidentiary hearing concluded, the postconviction court entered an order that included the following judgment:

> Therefore, it is ORDERED AND ADJUDGED that Defendant's Amended Motion To Vacate Judgments of Conviction And Sentence, is DENIED with respect to his Claims that he is entitled to a new guilt phase trial. It is further, ORDERED AND ADJUDGED that the Defendant's Amended Motion To Vacate Judgments of Conviction And Sentence, is GRANTED to the extent that he is entitled to a new penalty phase trial based on Ground IIA [Failure to conduct a reasonably competent mitigation investigation and failure to present mitigation], Ground IIB [Failure to ensure a reasonably competent mental health evaluation was conducted] and Ground IIC [Trial counsel failed to object to Arthur White's testimony claiming that Woodel told him that he fondled Mrs. Moody] of his Amended Motion To Vacate Judgments of Conviction And Sentence.

---

10. In his initial motion for postconviction relief, Woodel sought relief under the following general claims: Claim I—Deprivation of the right to reliable adversarial testing due to ineffective assistance of counsel during the guilt phase; Claim II—Deprivation of the right to reliable adversarial testing due to ineffective assistance of counsel during the penalty phase; Claim III—Deprivation of the right to due process to develop factors in mitigation because the psychologist engaged by the defense failed to conduct appropriate tests for brain damage or mental illness; Claim IV—Violation of the rules set forth in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Donnelly v. DeChristoforo, 416 U.S. 637 (1974); Claim V—Deprivation of a fair trial due to cumulative procedural and substantive errors; Claim VI—Violation of Eighth Amendment rights demonstrated by newly discovered evidence; and Claim VII—Violation (prospectively) of Eighth Amendment rights due to potential incompetence at the time of execution.

<u>State v. Woodel</u>, No. CF97-00047A-XX (Fla. 10th Cir. Ct. Dec. 28, 2011). The

postconviction court denied Woodel any relief for Claim I, subclaims E through G

under Claim II,[11] and Claims III through VII.

### III. DISCUSSION

On appeal, the State raises three general issues in which it asserts that

Woodel failed to establish that: (1) he was prejudiced regarding his assertion that

penalty phase counsel failed to investigate, prepare, and present a mitigation case

in a proper manner; (2) penalty phase counsel allegedly failed to ensure that

Woodel received a reasonably competent mental health evaluation; and (3) he was

prejudiced regarding his assertion that penalty phase counsel should have moved to

have certain testimony excluded that Woodel sexually fondled Mrs. Moody. We

reverse the postconviction court's order granting a new penalty phase, because

Woodel failed to satisfy both prongs set forth in <u>Strickland v. Washington</u>, 466

U.S. 668 (1984), to obtain postconviction relief due to allegations of ineffective

assistance of counsel where the death penalty has been imposed.

---

11. The subclaims under Claim II for which the postconviction court denied relief were: E—Counsel failed to object to hearsay testimony about Mrs. Moody's medical condition that allegedly made her more vulnerable; F—Counsel failed to re-raise the alleged spousal or marital communication privilege violation; G—Counsel failed to preserve for appellate review the trial court's excusing for cause two Spanish-speaking potential jurors. Woodel withdrew subclaim IID—Counsel failed to move to suppress Woodel's statement to law enforcement officers, or to obtain an interrogation specialist.

On cross-appeal, Woodel raises two general issues in which he asserts that: (1) guilt phase counsel provided ineffective assistance for failing to object to the admission of certain testimony that Woodel sexually fondled Mrs. Moody; and (2) the State violated the rules set forth in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). We deny Woodel's cross-appeal claim that he is entitled to new guilt and penalty phases by affirming the portion of the postconviction court's order that denied Woodel's motion for a new guilt phase.

## A. Ineffectiveness of Penalty Phase Counsel

### 1. Elements of the Claim

This Court has repeatedly upheld the <u>Strickland</u> standard in capital appeals that address allegations of ineffective assistance of trial counsel:

> Following the United States Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> > First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

- 11 -

> Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted).

Williamson v. State, 123 So. 3d 1060, 1065 (Fla. 2013), cert. denied, 134 S.Ct. 1519 (2014). When this Court has previously rejected a substantive claim on the merits, counsel cannot be deemed ineffective for subsequently failing to make a meritless argument. See Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012) (citing Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010)).

### 2. Standard of Review

In applying the Strickland standard where the defendant who was convicted in a capital case alleges ineffective assistance of counsel, this Court employs a mixed standard of review. We defer to the circuit court's factual findings that are supported by competent, substantial evidence, but review the circuit court's legal conclusions de novo. See Anderson v. State, 18 So. 3d 501, 509 (Fla. 2009) (citing Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004)).

There is a strong presumption that trial counsel does not provide ineffective assistance. See Strickland, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial

- 12 -

strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  "Judicial

scrutiny of counsel's performance must be highly deferential."  Id.

### 3.  Merits

### a.  Penalty phase counsel allegedly provided ineffective assistance by failing to properly investigate, prepare, and present a mitigation case.

The postconviction court's 2011 order stated the following regarding

Woodel's Claim IIA—Counsel's failure to conduct a reasonably competent

mitigation investigation and failure to present mitigation:

> The Defendant asserts in his Amended Motion, "Because Mr.
> Woodel's attorneys failed to conduct a reasonably competent
> investigation of Mr. Woodel's background, they failed to present
> reasonably available mitigation to the jury and to link it to the crimes,
> including giving adequate weight to the statutory mental mitigators."
> . . . .
>
> In preparing this Order, the [postconviction court] was particularly
> concerned with how [trial] counsel used the experience of the 1998
> penalty phase in preparation for the 2004 penalty phase.
> . . . .
>
> In Wiggins v. Smith, [539 U.S. 510, 521 (2003),] the [United
> States Supreme Court] went on to say, "In assessing the
> reasonableness of an attorney's investigation, however, a court must
> consider not only the quantum of evidence already known to counsel,
> but also whether the known evidence would lead a reasonable attorney
> to investigate further. . . ."
> In preparation for the [s]econd penalty phase, Mr. Colon talked
> to three family members. . . . He did not go to North Carolina or
> Michigan and he did not hire an investigator to do so.  All he did was
> review records and proceed with the same type of defense. . . .
> [Colon] acknowledged on redirect [examination by postconviction
> counsel] that it may have been a bad decision. . . .

- 13 -

In 2011, the postconviction court expressed concern about how counsel used the experience of the 1998 penalty phase in preparation for the 2004 penalty phase.

Although the sentencing order resulting from the penalty phase in 1998 was vacated by our decision in Woodel I, the continuity of certain aspects of counsel's performance during both the 1998 and 2004 penalty phases has relevance to the issues raised in this appeal. We address, without applying hindsight, the consequences of counsel's alleged failure to investigate, prepare, and present a proper mitigation case. Strickland, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight. . . ."); Cherry v. State, 659 So. 2d 1069, 1073 (Fla. 1995) ("The standard is not how present counsel would have proceeded, in hindsight . . . .").

During the 2011 evidentiary hearing, the postconviction court heard testimony from multiple experts and other witnesses concerning the relevant aspects of Woodel's background. The experts offered their opinions about Woodel's mental and emotional condition at the time of the crimes. Within its final order, the postconviction court expressed concern that former counsel Gilberto Colon inadequately prepared for the 2004 penalty phase.

The postconviction court concluded that penalty phase counsel's performance during Woodel's 2004 penalty phase was unreasonable under the prevailing professional norms for counsel representing defendants in capital cases

wherein the sentence of death has been imposed. As counsel for Woodel during the 2004 penalty phase, Colon had a duty to act reasonably by investigating available mitigation or to make an informed decision as to why such investigation was not necessary. See Strickland, 466 U.S. at 691; Coleman v. State, 64 So. 3d 1210, 1217 (Fla. 2011) ("Under [Strickland], 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' ") (quoting Strickland, 466 U.S. at 691).

In light of the circumstances presented in this case, we determine that there is no need for us to address whether counsel's performance was deficient during the penalty phase, as it pertains to his failure to investigate, prepare and present a proper mitigation case. Instead, we conclude that Woodel cannot demonstrate that he is entitled to a new penalty phase because he failed to establish prejudice under the second prong of the Strickland standard. See Williamson, 123 So. 3d at 1065; Davis v. State, 928 So. 2d 1089, 1105 (Fla. 2005) (quoting Maxwell, 490 So. 2d at 932); Waterhouse v. State, 792 So. 2d 1176, 1182 (Fla. 2001) ("[B]ecause the Strickland standard requires establishment of both prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong."). Furthermore, we see nothing in the record before us that undermines our confidence in the outcome of Woodel's penalty phase. See Sochor, 883 So. 2d at 771 (citing Strickland, 466 U.S. at 694).

- 15 -

In 2011, Colon testified at the postconviction evidentiary hearing that he defended Woodel during the penalty phases by emphasizing the following to the jury: (1) Woodel's alcohol consumption was one of multiple factors involved with these crimes; (2) Woodel had no violent criminal record; (3) Woodel grew up in a family with deaf parents; (4) Woodel's mother was abusive, neglectful, and provided a poor household environment; (5) Woodel and his sister stole food from the neighbors as often as possible; and (6) Woodel and his sister were placed by their parents in a children's home for a period of years.

We observe at the outset that the late Dr. Henry Dee, a clinical psychologist and clinical neuropsychologist, provided expert testimony before the jury that addressed and augmented the referenced aspects of the defense that Colon presented. Furthermore, the substance of Dr. Dee's expert opinions was directly reflected in the mitigating circumstances found by the sentencing court in 2004.

We find that the testimony provided by Dr. Dee during the 1998 trial and 2004 penalty phase is relevant in the present capital postconviction appeal. We have examined pertinent portions of the transcripts filed as part of the respective records in Woodel I and Woodel II, in which Dr. Dee appeared as an expert witness for the defense. The final order on review indicates that the postconviction court also reviewed Dr. Dee's 2004 testimony:

> The [c]ourt is of the opinion after reading the trial transcript of Dr. Henry Dee from the 2004 penalty phase, that Dr. Dee made a

- 16 -

determined effort to present as complete a mental health picture of the Defendant as possible. Considering his limited knowledge of [children of deaf adults] and the deaf culture, he did his best to try to convey to the jury how that factor impacted on Mr. Woodel.

See Order at 77-78. Because we determine it is relevant to the issues on appeal, we will address specific aspects of Dr. Dee's testimony in our discussion below.

### i. Counsel's Alleged Failure to Explore Woodel's Personal History and Family Background

Regarding Colon's handling of the presentation of mitigating circumstances in 2004, the postconviction court found that "[a]ll [Colon] did was review records and proceed with the same type of defense." The postconviction court also found that Colon conducted no additional investigation into Woodel's background for mitigation.

Following the 1998 penalty phase, the jury recommended by a vote of nine to three that the sentence of death be imposed for Mr. Moody's murder, and by a vote of twelve to zero that the sentence of death be imposed for Mrs. Moody's murder. In the 1998 penalty phase, Woodel did not testify. During the first trial, the court found substantial mitigation—one statutory mitigator (no significant history of criminal activity) and seven nonstatutory mitigators[12]—which were contrasted by its finding of four aggravators.[13]

---

12. See supra note 2.

13. See supra note 1.

- 17 -

Dr. Dee's testimony during the 1998 trial addressed Woodel's background and immediate family history. In summary, Dr. Dee testified that he: (1) reviewed all of the discovery material; (2) learned some time after his initial interviews with Woodel that both of his parents were deaf; (3) interviewed Woodel's father, Albert Woodel, his sister, Bobbi Woodel, his aunt, Margaret (Becky) Russell, his coworker Leola Kilbourn, and Kilbourn's daughter, Lisa; (4) learned from Woodel "the reason [Woodel's mother Jackie] wasn't here is that, after all, she has her own life. And [Dr. Dee couldn't] imagine a time in his life when [Woodel] needed his mother more than he does right now. And she's not here and [Dr. Dee] can't get in touch with her. I guess that's the way life had been for him"; (5) pointed out that because he was the eldest child, Woodel was born into a different household than Bobbi—i.e., Woodel was the only hearing person in his immediate family until Bobbi was born; (6) noted that Woodel had a tendency to sign while he spoke, signing is a "terribly different [language than] ours"; (7) learned from Woodel that his mother was not accepted by other people (family members described her as psychotic and his friends made fun of her); and (8) described Woodel's household as filled with domestic violence, child abuse and neglect, and alcohol and drug abuse.

The record shows that Woodel's former defense lawyers testified that they presented to the jury essentially the same mitigating circumstances in the 2004

penalty phase, including Dr. Dee's expert testimony, as they presented during the 1998 trial. The only exception to the same mitigation case was that Woodel testified for the first time during the 2004 penalty phase. We observe that Dr. Dee's 2004 testimony revisited certain points that he made during Woodel's 1998 penalty phase.

We find it significant that during Woodel's second penalty phase, Dr. Dee testified before the jury that he: (1) reviewed the discovery material obtained from the public defender's office—comprising investigation notes, summaries of the crime investigators and a copy of the taped confession; (2) interviewed Woodel's father, his sister, his aunt and two or three coworkers of Woodel's from Pizza Hut for an estimated four hours; (3) met with Woodel at least seven times for an estimated total of twelve hours; (4) spent a great deal of time with Woodel trying to understand the impact that belonging to a mother-father deaf household had on him; and (5) discussed various other pertinent aspects of Woodel's personal history and family background.

Notwithstanding the substantial mitigating circumstances that the trial court found during Woodel's 2004 penalty phase, the postconviction court concluded that penalty phase counsel provided ineffective assistance to Woodel because counsel neglected to explore other available mitigating circumstances. We agree that counsel failed to explore other mitigation about Woodel's personal history and

his multigenerational family background. And, it is evident from the postconviction evidentiary record that counsel did not explore Woodel's background stemming from his childhood years in Michigan and North Carolina even though such information could have been presented to the jury. However, we respectfully disagree with the postconviction court's legal conclusion that Woodel was prejudiced under the Strickland standard because the additional potential mitigating circumstances were of relatively minor importance and, therefore, the lack thereof does not undermine our confidence in the outcome of Woodel's 2004 penalty phase.

A review of Dr. Dee's unimpeached, expert testimony before the jury in 2004 demonstrates to our satisfaction that Woodel's troubled background was comprehensively presented to the jury. Dr. Dee discussed at length various aspects of Woodel's background including his status as a mother-father deaf person, the pronounced dysfunction of his immediate family's household, and his history of alcohol and drug abuse that began at a very early age. The jury was presented with expert testimony explaining the dynamics of Woodel's personal history and family background. The jury also heard Woodel's testimony that provided information consistent with Dr. Dee's expert opinion.

Consequently, we are satisfied that the jury received a thorough presentation of Woodel's life history and his relevant family background. We further conclude

that the presentation of Woodel's personal history and family background was instrumentally accomplished through the extensive expert testimony provided by Dr. Dee. We also note that Dr. Dee's testimony provided key testimonial evidence for the sentencing court's findings of the existing mitigating circumstances related to Woodel's personal history and family background. In 2004, Dr. Dee's testimony was informative and persuasive to the trier of fact.

Accordingly, we find that Woodel was not prejudiced by counsel's alleged failure to investigate, prepare, and present additional and relatively minor mitigation stemming from Woodel's personal history and family background. See Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007) ("Under Strickland, to demonstrate prejudice a defendant must show that there is a reasonable probability—one sufficient to undermine confidence in the outcome—that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (citing Strickland, 466 U.S. at 694).

### ii. Counsel's Alleged Failure to Consult with an Expert on the Effects of Alcohol Consumption

Next, Woodel alleges his trial counsel was ineffective because he chose not to present expert testimony to explain to the jury the cognitive effects of alcohol abuse beginning at an early age, and how alcohol affected him physically and mentally throughout his life. In support of his claim, Woodel asserts that Colon should have presented an expert who could explain that due to Woodel's blood

alcohol level, he was in a partial alcohol-induced blackout at the time of the murders. Woodel further asserts that given the fact that the jury voted seven to five in its recommendation that a death sentence be imposed, it is plausible that with additional mitigation testimony from an expert on alcohol consumption, the balance of aggravating and mitigating circumstances would have been different.

Colon testified on cross-examination during the 2011 evidentiary hearing that he did not consider using a toxicologist or a similar type of expert to explain to the jury the effects of alcohol or to calculate Woodel's blood alcohol level at the time of the crimes. Colon testified as follows:

> Well, my opinion, we live in Polk County and I knew that at least a good portion of those jurors knew what [it] is to be drunk, so I knew what a drunk person does when they're - - when they're drunk, such as do stupid things, have memory loss, things of that nature. So no, it never crossed my mind to get an expert to determine his blood alcohol or to get testimony . . . .

In responding to whether there were any foreseeable, negative consequences of presenting an expert on the effects of alcohol, Colon further testified that "when you start producing experts in every piece of the defense, I call that shotgun defense and now the jury starts questioning the validity of the actual defense."

The State contends that Colon's decision not to use an expert on the effects of alcohol should be viewed as a strategy that adhered to his theory for the 2004 penalty phase. The State points out that Colon testified that he wanted to humanize

Woodel—by presenting to the jury that Woodel's alcohol consumption was only one of several factors involved in his commission of the crimes.

The record in this case shows that Colon testified that he did not remember all of the circumstances involving his decision not to present expert testimony concerning the effects of Woodel's alcohol consumption. And, the record is silent about whether the non-use of an expert on the effects of alcohol consumption was a strategic decision by Woodel's defense team. But see, e.g., Davis v. State, 928 So. 2d 1089, 1119 (Fla. 2005) (finding counsel's strategy to preserve first and last closing arguments reasonable); White v. State, 559 So. 2d 1097, 1100 (Fla. 1990) (denying ineffectiveness claim that was based on counsel's unconventional courtroom actions that were attributed to trial strategy). Nevertheless, we decline to address whether Colon's performance is deficient under the first prong of the Strickland standard.

Instead, we conclude that Woodel was not prejudiced under the Strickland standard. Even if Colon's failure to present testimony from an expert on alcohol consumption constituted error, such error was harmless beyond a reasonable doubt. See Mendoza v. State, 87 So. 3d 644, 660-61 (Fla. 2011) ("The test for harmless error is whether there is a reasonable possibility that the error affected the verdict.") (citation omitted). We find that there is insufficient support in the record for recognizing a reasonable probability that, had counsel presented testimony

from an expert on the effects of alcohol consumption, the trier of fact would not have decided the death penalty was appropriate. See Rhodes v. State, 986 So. 2d 501, 512 (Fla. 2008) ("If counsel's failure to present the mitigating evidence was an oversight, and not a tactical decision, 'then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ").

We observe that during the 2004 penalty phase Dr. Dee testified, as he did during Woodel's first trial,[14] about how he assessed Woodel's self-described excessive alcohol consumption during the period of the crimes:

> Q. [Mr. Colon] As to the actual murders themselves, did you talk to the defendant in your discussions with him to find out what he said actually occurred [in those] early morning hours? Did you go through and try to elicit from him his scenario of what had happened?

---

14. During the 1998 trial, Dr. Dee provided pertinent testimony regarding Woodel's practice of alcohol consumption:

Q. [Mr. Colon] Did you speak with the defendant to find out what time he began in his life to consume alcoholic beverages?
A. Yes, to the best of my knowledge, and to his best estimate, it was sometime between 10 and 12 years of age.
Q. How did he characterize his usage from that point in time when he first started at age 10 or 12 until the time of this incident?
A. Well, according to his description, it was sporadic. But when he drank, he drank to intoxication. And you, know, from a mental health professional's point of view, what he was describing was binge drinking, what I would characterize as an alcoholic, although he declined to characterize it that way.
Q. So the way he described it was when he told you he would drink, he'd simply drink until he –
A. Was out [i.e., unconscious] . . .

- 24 -

A.  Well, I had been instructed not to on the first occasion that I saw him if you'll recall from the Public Defender's Office.  Later on when I went over the information with him, I mean after I started seeing him again, went over the statement that he gave to the police, basically I used that as an outline to interview him about it.  And he just didn't give me any other information about it[.]  [He] wasn't able to so far as I was able to tell.

Q.  So you gave him the opportunity to add to or take away from the statement he had given to the police?

A.  Yeah.  And he didn't -- as I recall, he didn't tell me anything significantly different.

Q.  Well, in the statement to the police, he told them that he had had maybe seven or eight beers to drink.  Is that what he told you?

A.  No, he did add to that.  He told me that he had told the police he had seven or eight beers to drink but he actually had a lot more than that but he didn't want to tell them that he drank any more because he didn't want them to think, A, that he was drunk or, B, he was using it for an excuse.

Q.  So he told you that he did lie to the police or at least attempt to?

A.  Yeah, about that.  Which is actually rather odd.  Most people lie in the opposite direction when they're looking for something exculpatory, you know.  To excuse what they're doing, they'll say they drank more than they did.  But he said he drank much less than he apparently did.

Dr. Dee explained, and during the 2004 penalty phase Woodel confirmed during his testimony, that Woodel substantially underrepresented to the police the actual amount of alcohol that he consumed on the night he murdered the Moodys. Woodel apparently under-represented how much he drank in the hours immediately before the Moody murders, because he had an inexplicable aversion to admitting to the detectives the actual amount of alcohol that he consumed. Thus, we observe that Dr. Dee's 2004 testimony, in the context of his evaluation of

Woodel's psychological and emotional profile, provided the jury with information showing that Woodel had had problems with excessive alcohol consumption that he was dealing with at the time of the crimes. Dr. Dee's testimony further addressed that in the period of his life prior to the Moodys' murders, Woodel exhibited the behavior of an alcoholic. Colon recalled that he assessed during Woodel's trial that the jurors who lived in Polk County were aware that when someone gets drunk they have memory losses and "things of that nature."

The postconviction evidentiary record shows that during the 2011 hearing Dr. Daniel Buffington, a clinical pharmacologist, provided his expert opinion about the effects alcohol had on Woodel's behavior. From his interviews with Woodel, Dr. Buffington identified certain factors that put Woodel at risk for experiencing partial alcohol-induced blackouts—including family history, genetic predisposition, and binge drinking. Dr. Buffington assessed, as did Dr. Dee, that Woodel exhibited the signs of chronic alcoholism. Dr. Buffington further testified that partial alcohol-induced blackouts would have permitted Woodel to be functional, but experience memory loss of the events pertaining to the crimes. The record shows that Woodel apparently only experienced memory loss about certain aspects of the crimes. For example, when being interviewed by detectives, Woodel stated that he could not remember: (1) how he wrested the serrated-edged knife (the murder weapon) from Mrs. Moody; (2) why her body was found completely

nude, except for one sock; or (3) why her panties and nightgown had been wadded up and cast aside near the bed where her body was found.

However, it is evident from the record before us that Woodel was able to recall many pertinent details about the events pertaining to the Moodys' murders during his recorded interview by police detectives. For example, Woodel described how he: (1) entered the Moodys' residence without invitation in the hours before sunrise; (2) inflicted numerous stab and cut wounds on two elderly persons who were many decades older than he; (3) shattered a porcelain toilet tank lid over Mrs. Moody's head to stop her from yelling; and (4) took items from the Moodys' residence including Mr. Moody's wallet, keys, and other items that did not belong to Woodel.

Even if Dr. Buffington's testimony concerning Woodel's probable alcohol-induced partial blackout, or some other comparable expert's testimony had been presented to the penalty phase jury in 2004, we conclude that such expert testimony is not dispositive for establishing prejudice under Strickland. We determine that Woodel's recorded interview with detectives, which was admitted into evidence, included statements that were sufficiently inculpatory regarding his convictions. Furthermore, Woodel's recorded interview provided some of the direct evidence for the trier of fact's finding of the weighty aggravating circumstances during Woodel's second penalty phase in which the trial court

imposed the sentence of death. See Sochor, 883 So. 2d at 771 ("In the penalty phase context, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' ") (quoting Strickland, 466 U.S. at 695). Therefore, despite the relative validity of Dr. Buffington's partial alcoholic blackout theory, as applied in Woodel's case, the lack of such in-court expert testimony in 2004 does not undermine our confidence in the outcome of Woodel's second penalty phase. At most, the lack of such expert testimony constitutes harmless error based on this record.

### iii. Counsel's Alleged Failure to Locate an Expert on Children of Deaf Adults (CODA)

Next, Woodel alleges his trial counsel was ineffective for failing to locate and consult with an expert on the deaf culture and its impact on CODA. According to Woodel, Colon's reliance on Dr. Dee's inadequate testimony about Woodel's CODA status prejudiced him during the 2004 penalty phase. Instead, Woodel urges us to conclude that the testimony of CODA expert, Dr. Alan G. Marcus, during the 2011 postconviction evidentiary hearing demonstrates why Colon was ineffective regarding his failure to locate a CODA expert.

The postconviction evidentiary record shows that Dr. Marcus testified that there were numerous studies available about CODA in 2004. Dr. Marcus also testified that the scholarly book Dr. Dee read to provide consultation about CODA

to Woodel's defense counsel in 1998 and 2004 was an anthropological study, not a psychological review. The postconviction court observed that: "[Dr.] Marcus concluded that Dr. Dee did not totally understand the profound effect of having two deaf parents had on [Woodel]." The State argues that there is no showing that Colon could have readily uncovered a CODA expert in 2004.

In the 1998 and 2004 court proceedings, Dr. Dee provided extensive and unimpeached expert testimony about the deaf culture in general, and persons with "mother-father deaf" status in particular. After reviewing Dr. Dee's testimony, we determine that his reference to Woodel's "mother-father deaf" status is equivalent to the parties' present discussion of Woodel's CODA status. In our view, Dr. Dee utilized his expertise and experience as both a clinical psychologist and clinical neuropsychologist to provide extensive testimony that was relevant in Woodel's sentencing phase. In 1998, Dr. Dee testified that he performed independent research and also utilized the assistance of a professional librarian to familiarize himself with the deaf culture and mother-father deaf subculture. In 2004, Dr. Dee again testified about his additional research into the deaf culture; he also discussed his understanding of the mother-father deaf subculture.

Given the quality of testimony Dr. Dee provided to the jury in 2004, we determine that the jury was presented with a reasonably clear description of Woodel's background in a mother-father deaf household, and his life within the

deaf culture. Notwithstanding that the prevailing terminology has apparently been most recently designated as CODA, the jury was presented with relevant expert testimonial evidence from Dr. Dee concerning Woodel's CODA status during the 2004 penalty phase. We note that the sentencing court found the nonstatutory mitigating circumstance that his parents were deaf and spoke primarily in sign language—giving that factor moderate weight. We conclude that the trier of fact had a sufficiently thorough presentation about the mitigating circumstances that existed concerning Woodel's status as a CODA and, therefore, our confidence in the outcome of the penalty phase has not been undermined regarding this subclaim based on counsel's failure to present cumulative mitigation.

### b. Penalty phase counsel allegedly provided ineffective assistance by not ensuring that Woodel received a reasonably competent mental health evaluation.

The postconviction court's order made the following findings and conclusion of law regarding Woodel's Claim IIB—Counsel's failure to ensure a reasonably competent mental health evaluation:

> The Defendant alleges that[:] Counsel failed to ensure that Mr. Woodel received reasonably competent mental health evaluation and failed to retain reasonably qualified experts to determine the extent of Mr. Woodel's mental, emotional and psychological deficits due to his neglect and the abuse he suffered throughout his childhood. . . .
> . . . At the evidentiary hearing, Dr. Cunningham, a clinical and forensic psychologist, testified extensively about the factors that put someone at risk for alcohol and drug abuse, and how those factors could be applied to Mr. Woodel. Dr. Daniel Buffington, a clinical pharmacologist testified at the evidentiary hearing regarding alcoholic

- 30 -

blackouts and cognitive and physical effects of alcohol consumption [and calculated that Woodel consumed] between 12 and 24 beers. Dr. Alan G. Marcus, a Clinical Psychiatrist who works with deaf and hard of hearing adults and families, including CODAs [children of deaf adults], discussed the deficiencies in Dr. Dee's presentation with respect to the special problems faced by Mr. Woodel as a CODA. . . . Considering [Dr. Dee's] limited knowledge of CODA and the deaf culture, he did his best to try to convey to the jury how that factor impacted on Mr. Woodel.

. . . The [postconviction court] finds that [trial] counsel's performance fell below an objective standard of reasonableness with respect to Claim IIB of the Defendant's Motion. The [postconviction court] finds that but for this deficient performance there is a reasonable probability that the result of the proceedings would have been different, and Mr. Woodel may have received a life recommendation.

The postconviction court considered testimony from three experts (Drs. Cunningham, Buffington, and Marcus) in drawing its conclusion that trial counsel failed to ensure that Woodel received a reasonably competent mental health evaluation. However, the postconviction court did not explain how such expert testimony influenced its conclusion that Woodel was prejudiced by Colon's alleged professional errors during the 2004 penalty phase. And, the postconviction record provides insufficient testimonial evidence from the identified experts that trial counsel failed to ensure Woodel had a proper mental health evaluation in preparation for trial.

Colon testified during the postconviction evidentiary hearing "that there was no testimony or evidence available that Mr. Woodel had any mental illness." Colon further testified that "Dr. Dee looked for [any mental illness] but came up

empty." Colon further testified that "growing up in the family that [Woodel] grew up [in] and the environment that he grew up in may have provided a basis for this, but Dr. Dee could not pinpoint that."

The record filed along with Woodel's previous appeals to this Court also shows that Dr. Dee examined and performed the mental health evaluation of Woodel for the defense. Dr. Dee also provided multi-faceted information about Woodel's life history within his report to Woodel's defense team. The postconviction court did not state why Colon's reliance on Dr. Dee's mental health evaluation of Woodel, in lieu of obtaining such an evaluation by another mental health clinician, resulted in Woodel receiving an unreliable penalty phase in 2004.

Based on the evidence presented to the jury, including information provided from Dr. Dee's mental health evaluation of Woodel, the sentencing court found extreme emotional disturbance as a statutory mitigating circumstance and accordingly assigned it little weight. Furthermore, the experts that testified during the postconviction evidentiary hearing addressed issues that had been previously identified and given weight as mitigating circumstances during Woodel's 2004 penalty phase: (1) Drs. Cunningham and Buffington identified certain risks associated with Woodel's alcohol and drug abuse—this circumstance was found as the statutory mitigator of substantial impairment of capacity to appreciate his actions or conform his conduct to the requirements of law (given little weight), and

nonstatutory mitigator abuse of alcohol and drugs (given little weight); and (2) Dr.

Marcus opined that there were special psychological and emotional problems faced

by CODA—this circumstance was found as the statutory mitigator of extreme

emotional disturbance (given little weight), and the nonstatutory mitigator of being

a child of parents who were deaf and spoke primarily in sign language (given

moderate weight).  Based on the totality of the record, our confidence in the

outcome is not undermined so as to establish prejudice, because there is no

evidence that Woodel did not receive a reasonably competent mental health

evaluation in preparation for trial.

## c. Penalty phase counsel allegedly provided ineffective assistance by failing to move to exclude testimony by Arthur White that Woodel sexually fondled Mrs. Moody.

The postconviction court's 2011 order includes the following statements

regarding Woodel's Claim IIC—Counsel's failure object to Arthur White's

testimony that Woodel fondled Mrs. Moody:

> The [postconviction court] finds that counsel was deficient in the penalty phase in 2004 just as in 1998 with regard to not filing a motion to exclude this testimony.  The prejudicial effect of this testimony regarding fondling far outweighed the probative value of the testimony.  Because this was a death case, . . . the [postconviction court] is concerned that but for this deficiency of [penalty phase] counsel the result of the 2004 penalty phase proceedings would have been different.  The [postconviction court] finds that counsel's performance fell below an objective standard of reasonableness with respect to Claim IIC of the Defendant's Motion.  The [postconviction court] finds that but for this deficient performance there is a reasonable probability that the result of the proceedings would have

- 33 -

been different, and Mr. Woodel may have received a life recommendation.

The postconviction court found that Colon was deficient in the 1998 and 2004 penalty phases for not filing a motion to exclude White's testimony because the prejudicial effect regarding fondling far outweighed the probative value. However, the State aptly points out that in Woodel II, we previously decided the issue of whether White's challenged testimony should have been excluded at trial.

> Woodel provides no direct authority as to why White's statements would be improper other than alleging that this was irrelevant and highly inflammatory, constituting a nonstatutory aggravating circumstance. Section 921.141(1), Florida Statutes (2005), which governs the penalty-phase proceedings, provides in pertinent part that evidence "relevant to the nature of the crime and the character of the defendant" is admissible "regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements." In this case, White's statements regarding Woodel's confession that he pushed Bernice into the bedroom and fondled her were relevant to the nature of the crime. Woodel failed to show a meritorious basis for excluding this testimony and clearly did not demonstrate why the admission of this evidence constituted fundamental error.

985 So. 2d at 530. In Woodel II, we determined that White's testimony was "relevant to the nature of the crime" and, therefore, Woodel cannot demonstrate prejudice regarding counsel's failure to file a motion in limine.

### 4. Cumulative Analysis of the Allegations of Ineffective Assistance of Trial Counsel

The postconviction court found it unnecessary to perform a cumulative assessment of alleged trial counsel errors in light of its judgment that penalty phase

counsel was ineffective. And, although neither party raises any cumulative effect of trial counsel errors on this appeal, we nevertheless address the reasons why there is no cumulative effect of the alleged errors entitling Woodel to relief due to ineffective assistance of trial counsel. See Anderson v. State, 18 So. 3d 501, 520 (Fla. 2009) (rejecting a claim of cumulative error when appellant's claims, addressed individually, did not establish ineffective assistance of counsel or that appellant's constitutional rights were violated) (citing Israel v. State, 985 So. 2d 510, 520 (Fla. 2008)); Suggs v. State, 923 So. 2d 419, 441 (Fla. 2005) (stating the cumulative effect of evidentiary errors and allegations of ineffective assistance of trial counsel will be considered together).

First, we find no reasonable probability that the proposed additional mitigating circumstances pertaining to Woodel's personal history and family background would have had any impact on the trier of fact, because such information would have been cumulative to evidence that was presented and the mitigating circumstances that were found during Woodel's second penalty phase. See Rhodes, 986 So. 2d at 512-13 ("Even if we were to find counsel's conduct deficient, [the defendant] cannot demonstrate prejudice. Any testimony the additional witnesses would have provided would have been cumulative to that provided by the witnesses at resentencing. . . . The additional testimony would only have added to the mitigation already found. Even if given more weight, the

mitigation would not outweigh the three strong aggravators . . .") (citation omitted).

Next, the record reflects that, despite the lack of testimony from an expert on the effects of alcohol consumption, the trier of fact was able to understand from Dr. Dee's testimony and other evidence that Woodel was an alcohol abuser who had difficulty dealing with his alcohol abuse during the period when he murdered the Moodys. Thus, even if counsel's failure to present testimony from an expert on alcohol consumption constituted error, it was harmless error. See Floyd v. State, 850 So. 2d 383, 408 (Fla. 2002) (citing Whitton v. State, 649 So. 2d 861, 864–66 (Fla. 1994) (applying cumulative error analysis and determining there was no reasonable probability that the cumulative impact of harmless errors affected either the jury's verdict or the defendant's overall right to a fair trial)).

Next, we determine that there is no reasonable probability that additional testimonial evidence about Woodel's CODA status from another expert would have changed the outcome of Woodel's second penalty phase; therefore, our confidence is not undermined because such evidence would have been cumulative to what the trier of fact actually heard. See Butler v. State, 100 So. 3d 638, 667 (Fla. 2012) ("[W]here the additional mitigation is minor or cumulative and the aggravating circumstances substantial, we have held that confidence in the outcome of the penalty phase is not undermined.") (citation omitted).

Next, the postconviction evidentiary record does not show that any expert explained why the mental health evaluation performed on Woodel for trial was not competent, or identified any previously undisclosed mental health issue that would have had a reasonable probability of changing the judgment of the trier of fact to impose the sentence of death. See Kilgore v. State, 55 So. 3d 487, 504 (Fla. 2010) ("Kilgore has failed to demonstrate that the proffered evidence [of failure to ensure an adequate mental health evaluation was performed for trial] had a reasonable probability of changing the outcome, which is a probability sufficient to undermine our confidence in the verdict.").

Finally, Woodel's allegation that trial counsel was ineffective for failing to move to exclude Arthur White's testimony is unavailing. As noted above, in light of our decision in Woodel II, trial counsel cannot be deemed ineffective for declining to file a motion in limine concerning this claim.

We find no cumulative error because the allegedly unexplored mitigating circumstances were: (1) cumulative to those presented during the second penalty phase; (2) insufficiently demonstrated during the postconviction evidentiary hearing; or (3) otherwise failed to satisfy the Strickland standard. See generally Bradley v. State, 33 So. 3d 664, 684 (Fla. 2010) ("Where, as here, the alleged errors urged for consideration in a cumulative error analysis 'are either meritless, procedurally barred, or do not meet the Strickland standard for ineffective

assistance of counsel[,] . . . the contention of cumulative error is similarly without merit.' ") (quoting Israel, 985 So. 2d at 520).  Furthermore, because we do not find multiple errors in this case, there is no cumulative error effect that establishes prejudice.  See Johnson v. State, 104 So. 3d 1010, 1029 (Fla. 2012) ("[B]ecause multiple errors did not occur in this case, Johnson's claim of cumulative error must fail.").  Despite the lower tribunal's detailed order granting Woodel postconviction relief as to the penalty phase, most of its findings relate to its judgments about counsel's deficiency, and there are only conclusory statements regarding prejudice.

In conclusion, we find the assertions that trial counsel's professional errors deprived Woodel of a fair second penalty phase fail to satisfy the prejudice prong of the Strickland standard.  Thompson v. State, 990 So. 2d 482, 490 (Fla. 2008) (quoting Strickland, 466 U.S. at 687); see also Strickland, 466 U.S. at 700 ("Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed.").  Accordingly, Woodel is not entitled to a third penalty phase.

### B. Ineffectiveness of Guilt Phase Counsel (Cross-Appeal)

### 1. Merits

### a. The postconviction court allegedly erred in finding that trial counsel's failure to consult with an expert about the effects of alcohol did not prejudice Woodel during the 1998 guilt phase.

The postconviction court denied Woodel relief from ineffective assistance of counsel under this claim regarding his convictions during the 1998 guilt phase. The court below found that Allen R. Smith, guilt phase counsel, was deficient to the extent that Smith did not "at least consult with a toxicologist or similar type of expert to determine if such an expert could provide useful assistance to the defense with regard to [the defense's] argument of voluntary intoxication and lack of premeditation on part of the Defendant." However, the postconviction court found no prejudice pursuant to the Strickland standard. Therefore, the postconviction court denied Woodel relief based on his allegation of ineffective assistance of counsel, because Woodel would still have been found guilty of first-degree felony murder. We agree.

Woodel's argument that Smith provided ineffective assistance of guilt phase counsel for allegedly failing to consult with an expert on the effects of Woodel's alcohol consumption is without merit. In our decision pertaining to Woodel's first direct appeal, we acknowledged that the trial court specifically rejected the defense's assertion that Woodel was so intoxicated that he could not form the intent to kill. See Woodel I, 804 So. 2d at 321. And, we subsequently affirmed all of Woodel's convictions on direct appeal, including those for the two counts of first-degree murder. Id. at 327. The record shows that there was also legally sufficient evidence to support alternative convictions of Woodel for first-degree

- 39 -

felony murder.  Accordingly, the postconviction court's order is affirmed to the extent it denies Woodel a new guilt phase based on Woodel's claim that Smith was ineffective for failing to consult an expert on the effects of alcohol consumption. See Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012) (citing Schoenwetter, 46 So. 3d at 546) (stating trial counsel is not ineffective for failing to make a meritless argument).

**b.  The postconviction court allegedly erred in finding that trial counsel's failure to object to Arthur White's testimony did not prejudice Woodel during the 1998 guilt phase.**

The postconviction court denied Woodel relief based on his allegation of ineffective assistance of counsel for failure to object to White's testimony during the 1998 guilt phase.  The lower tribunal concluded that there was no evidence presented during the 2011 evidentiary hearing to demonstrate that Smith was deficient for not filing a motion to exclude White's testimony that Woodel admitted to sexually fondling Mrs. Moody.  The postconviction court also concluded that there was no prejudice under the Strickland standard because the State's case against Woodel "was very strong" and, thus, the results of the 1998 guilt phase proceedings would not have been different.

We have previously decided, for the reasons discussed above, that there was no showing that the admission of White's testimony constituted fundamental error. Woodel II, 985 So. 2d at 530.  Accordingly, we now determine that Woodel is not

- 40 -

entitled to any relief concerning his cross-appeal claim that Smith was ineffective for not making efforts to exclude White's testimony about Woodel allegedly fondling Mrs. Moody because this claim is procedurally barred. Miller v. State, 926 So. 2d 1243, 1256 (Fla. 2006).

### C. Alleged Brady and Giglio Violations (Cross-Appeal)

The postconviction court found that Woodel did not prove any of his allegations that the State violated his rights under Brady or Giglio. We now address Woodel's specific Brady and Giglio cross-appeal claims in turn.

### 1. The postconviction court allegedly erred in finding that the State did not commit Brady violations in its presentation of Arthur White's testimony.

### a. Elements of the Claim

More than a decade ago, the Supreme Court of the United States reiterated that in order to establish a Brady violation, a defendant must show that there is evidence: (1) favorable to the defendant—either exculpatory or impeaching; (2) willfully or inadvertently suppressed by the State; and (3) that caused the defendant to be prejudiced, because it was material. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

With regard to any alleged Brady claims, we have previously explained that the second prong of the analysis is not satisfied "where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable

diligence." Floyd v. State, 18 So. 3d 432, 451 (Fla. 2009) (quoting Provenzano v. State, 616 So. 2d 428, 430 (Fla. 1993)).  In addition, in order to establish the materiality of disputed evidence under the third prong of the Brady analysis, the defendant must demonstrate a reasonable probability that, had the evidence been disclosed to the defense, the jury would have reached a different verdict.  See Duest v. State, 12 So. 3d 734, 744 (Fla. 2009).  We have previously defined "reasonable probability" to be "a probability sufficient to undermine confidence in the outcome."  Id.

### b.  Standard of Review

This Court applies a mixed standard of review on postconviction Brady claims.  See Griffin v. State, 114 So. 3d 890, 905 (Fla. 2013) ("Where the trial court has conducted an evidentiary hearing, this Court will defer to the factual findings of the trial court that are supported by competent, substantial evidence, but will review the application of the law to the facts de novo.") (citing Sochor, 883 So. 2d at 785 and Lowe v. State, 2 So. 3d 21, 29 (Fla. 2008)).

### c.  Merits

#### i.  The State allegedly failed to disclose evidence in 2004 about White's alleged deal with the State.

We find nothing in this record to contradict the postconviction court's judgment that there was no evidence that White made a deal with the State to testify against Woodel.  Thus, there is no showing that any evidence favorable to

Woodel existed to satisfy the first prong under <u>Brady</u> for Woodel to obtain any relief. Accordingly, we affirm the postconviction court's 2011 order denying Woodel relief.

### ii. White's allegedly false testimony about his felony conviction record.

The postconviction court denied relief under <u>Brady</u>, and we see nothing in the record that supports Woodel's contention that the State violated the tenets of <u>Brady</u> regarding White's allegedly false testimony. White's prior felony conviction record was readily available to Woodel's defense team and, therefore, White was subject to impeachment under cross-examination by the defense. Whether White was confused about the number of felony convictions that he had when he testified that the number "was about five," or if he simply asserted untruths about his felony conviction record as being lesser in number than it actually was is inconsequential. The correctness of White's testimony is not dispositive to our consideration of whether Woodel is entitled to any relief. Woodel fails to satisfy the second prong under <u>Brady</u> because the information about White's felony convictions was not suppressible by the State. See <u>Floyd</u>, 18 So. 3d at 451. Again, Woodel fails to establish sufficient proof for an element under the <u>Brady</u> standard to obtain relief. Accordingly, we affirm the postconviction court's 2011 order denying Woodel any relief to the extent he

alleges a <u>Brady</u> violation occurred with regard to White's testimony about his prior felony conviction record.

**2. The postconviction court allegedly erred in finding that the State did not commit <u>Giglio</u> violations in its presentation of Arthur White's testimony.**

### a. Elements of the Claim

In previous cases, we have stated that whenever a claimant alleges that the prosecutor has acted in violation of <u>Giglio</u>, the claimant must show the following: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew that the testimony was false; and (3) the false testimony was material. <u>See</u> <u>Guzman v. State</u>, 868 So. 2d 498, 505 (Fla. 2003) (citing <u>Ventura v. State</u>, 794 So. 2d 553, 562 (Fla. 2001)). With regard to the third prong of <u>Giglio</u>, "the false evidence is material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " <u>Id.</u> at 506 (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976)). Under the <u>Giglio</u> analysis, once the defendant has established that the State knowingly presented false testimony, the State bears the burden of proving that the false testimony was not material. <u>Id.</u>; <u>see also</u> <u>Johnson v. State</u>, 44 So. 3d 51, 64 (Fla. 2010) ("Once the first two prongs are established, the State bears the burden of showing that the false evidence was immaterial by showing that its use was harmless beyond a reasonable doubt.").

### b. Standard of Review

In our consideration of postconviction <u>Giglio</u> claims we apply a mixed standard to resolve questions of law and fact. <u>See</u> <u>Johnson</u>, 44 So. 3d at 65 ("A court's decision with respect to a <u>Giglio</u> claim is a mixed question of law and fact, and a reviewing court will defer to the lower court's factual findings if they are supported by competent, substantial evidence, but will review the court's application of law to facts de novo.") (citing <u>Sochor</u>, 883 So. 2d at 785).

## c. Merits

### i. The State allegedly presented false testimony from White.

There is simply no showing in the record that a deal was struck between White and the State regarding White's testimony against Woodel. Here, Woodel urges us to infer that because White was an habitual felony offender, who had been in and out of prison for twenty-five years, White should not have been able to receive relatively lenient sentences for his then new convictions. In addition, Woodel asserts that White's prison terms were to be followed by a moderate probation period. Woodel argues that the inexplicable leniency shown in White's eventual sentencing evinces that White had a deal with the State to testify against Woodel. The <u>Giglio</u> standard requires that Woodel bear the burden of persuasion that White's testimony at issue was false, and that the State knowingly presented White's false testimony to a jury, without correction. <u>Id.</u> at 64. However, Woodel fails to carry his burden by his use of inductive reasoning with regard to White's

supposedly lenient sentences. Accordingly, we affirm the postconviction court's 2011 order to the extent it denies Woodel any relief pursuant to his allegation that the State violated Giglio concerning a supposed deal it made in exchange for White's testimony against Woodel.

Woodel also alleges that White gave false testimony concerning his felony conviction record, and that the State failed to correct it. Assuming, arguendo, that Woodel can carry his burden under the first two prongs, we evaluate whether the State can carry its burden under the third prong of the Giglio analysis by showing that White's allegedly false testimony was not material. Id.

The State argues that White's testimony was not material because it is reasonable that the jury's verdict would not have been affected by White's allegedly false testimony. The State further argues that the jury was well aware that White had been in and out of prison during his then twenty-five-year history as a habitual offender; and that White was motivated to testify against Woodel, because he hoped to gain some benefit from his testimony.

We, therefore, conclude that the allegedly "false testimony" from White was not material in Woodel's case because there is no reasonable possibility that the jury's verdict was affected by White's openly self-serving testimony. Accordingly, we affirm the postconviction court's 2011 order to the extent it

denies Woodel any relief because there is no evidence establishing that the State violated <u>Giglio</u> regarding any allegedly false testimony provided by White.

## IV. CONCLUSION

In reversing the postconviction court's judgment that Woodel be afforded a new penalty phase, we briefly pause to reiterate our continual adherence to the general premise that the appellate courts of this State should give all due deference to the trial courts' findings of fact that are based on competent, substantial evidence.[15] However, we respectfully disagree with the postconviction court's conclusions of law concerning the issues raised by the State in this case.

We hold that Woodel is not entitled to any relief due to ineffective assistance of counsel under the <u>Strickland</u> standard. Accordingly, we reverse the postconviction court's 2011 final order only to the extent the order affords Woodel a new penalty phase. In every other respect, we affirm the postconviction court's order and, therefore, hold that Woodel is not entitled to any of the relief he seeks in his cross-appeal. Woodel's sentence of death is hereby reinstated.

It is so ordered.

---

15. <u>See generally</u> <u>Stephens v. State</u>, 748 So. 2d 1028, 1034 (Fla. 1999) ("When sitting as the trier of fact, the trial judge has the 'superior vantage point to see and hear the witnesses and judge their credibility.' Appellate courts do not have this same opportunity. Despite this deference to a trial court's findings of fact, the appellate court's obligation to independently review mixed questions of fact and law of constitutional magnitude is also an extremely important appellate principle.") (internal citations omitted).

QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., concurs in result with an opinion, in which POLSTON, C.J., concurs.
PARIENTE, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED


CANADY, J., concurring in result.

I concur with the majority's decision reversing the portion of the trial court's order granting a new penalty phase and affirming the portion of the trial court's order denying a new guilt phase. Even assuming that Thomas Woodel demonstrated that his trial counsel conducted an unreasonable penalty phase investigation, Woodel failed to establish that he was prejudiced as required by Strickland v. Washington, 466 U.S. 668 (1984).

In this case, the postconviction court wrote a detailed order in which it concluded that trial counsel erred by failing to: (1) consult a toxicologist or similar expert to testify about the role Woodel's alcohol abuse played in the crimes; (2) investigate and present a multigenerational history showing the pattern of alcoholism, abuse, and abandonment in Woodel's family; (3) present a reasonably competent mental health evaluation; and (4) file a motion to exclude witness White's testimony. The postconviction court did not, however, include any reasoning for its conclusion that these errors prejudiced Woodel. I agree with the

- 48 -

majority's determination that the postconviction court's unexplained finding of prejudice cannot withstand scrutiny.

After explaining the legal error in the postconviction court's determination that trial counsel erred by failing to file a motion to exclude White's statements, the majority—contrary to the dissent's criticism—examines "whether counsel's deficiency as a whole operated to undermine confidence in the outcome of the penalty phase." Dissenting op. at 59. The majority explains that the "allegedly unexplored mitigating circumstances" were either cumulative to mitigating evidence actually presented, insufficiently proven at the evidentiary hearing, or not significant enough to undermine confidence in the penalty phase as required by Strickland. Majority op. at 38. As a result, the majority concludes that even when considered cumulatively, "the assertions that trial counsel's professional errors deprived Woodel of a fair second penalty phase fail to satisfy the prejudice prong of the Strickland standard." Majority op. at 39. This conclusion—unlike the postconviction court's unexplained finding of prejudice—is supported by the record.

During the 2004 penalty phase, trial counsel called Woodel, his sister Bobbie, his father Albert, and an aunt who helped raise them to testify about the abuse and extreme neglect Woodel suffered as a child. Woodel and Bobbie also testified about Woodel's adult life, including his abuse of alcohol. The defense

then called Dr. Henry Dee, a clinical psychologist and neuropsychologist, who explained the psychological impact of Woodel's experiences and addressed some of the unique difficulties that Woodel suffered as a result of being a hearing child of deaf parents.

Based on this testimony, the sentencing court concluded that the defense proved four statutory mitigating factors—including both mental health mitigating factors—and fourteen nonstatutory mitigating factors. Regarding the circumstances of the offense, the sentencing court found that on the night of the crime, Woodel felt "acutely alone" and quickly drank "an unquantified amount of beer that may have been as much as twenty-four cans or bottles," that left Woodel unable to "recall what he was doing during some of the time leading up to the crime." State v. Woodel, No. CF97-00047A-XX at 5-6 (Fla. 10th Jud. Cir. Jul. 1, 2005) (Sentencing Order). When reviewing Woodel's background, the sentencing court concluded that Woodel had been neglected and rejected by his parents and others. The sentencing court stated that Woodel's parents were alcoholics and described his father as "often cruel" and his mother as unreliable and uncaring. Id. at 6. The sentencing court included examples of the hardships endured by Woodel, including that Woodel and his sister were once left so hungry that they had to steal food from a neighbor, that Woodel's brother had tried to drown him, that all three children were abandoned without explanation at a children's home, and that

- 50 -

Woodel may have been sexually abused by a person invited into the home by one of his parents.

The sentencing court found these mitigating factors were weighty but ultimately concluded that they did not outweigh the serious aggravating factors that applied to the murder of Bernice Moody: (1) Woodel was previously convicted of a contemporaneous capital felony; (2) the murder was committed during the commission of a burglary; (3) the murder was especially heinous, atrocious, or cruel; and (4) the victim was particularly vulnerable due to advanced age or disability. Id. at 2-4. The sentencing court explained that Woodel's impaired capacity could not be given more than moderate weight due to the "pitiless, cruel manner in which he murdered Mrs. Moody" and reasoned that the period during which Woodel ceased stabbing Bernice to search for a heavy object to use as a bludgeon established that Woodel "was not substantially impaired throughout the entire episode." Id. at 5-6.

The mitigating evidence presented during the postconviction evidentiary hearing primarily differed from the penalty phase evidence in that it provided more detail about deaf culture and documented the dysfunction of several generations of Woodel's extended family, not just the family members who spent considerable time with Woodel. The postconviction evidence—considered as a whole—did not, however, paint a materially different picture of Woodel's mental state or "change[]

- 51 -

the very nature of the crime." Dissenting op. at 78. No evidence at the hearing established a reason—other than burglary—for the attack or refuted the evidence that despite Woodel's intoxicated state and usual mild demeanor, the attack on Bernice lasted for "some time" and involved both the repeated stabbing and bludgeoning of a partially disabled seventy-four-year-old woman. Sentencing Order at 5. Regardless of any flaws in trial counsel's investigation, the postconviction presentation did not undermine confidence in the 2004 penalty phase.

The dissent's position that Woodel did prove that he was prejudiced appears to rest primarily on an exaggerated view of the differences between the postconviction testimony of clinical psychologist Dr. Alan Marcus and Dr. Dee's 2004 penalty phase testimony. The dissent rests on the unfounded conclusion that "Dr. Marcus's testimony, if it had been presented, would have provided the jury a completely different picture of how the crime occurred and substantially increased the mitigation available to the finder of fact." Dissenting op. at 71.

First, Dr. Marcus's testimony did not establish a mitigating "possible explanation as to how this baffling crime transpired." Id. At the evidentiary hearing, Dr. Marcus testified that "in the early days before the advent of flashing lights and doorbells[] that would have lights and buzzers," deaf people "usually left their doors open" because "if they locked them and they had a guest or visitor . . .

- 52 -

they would never hear the door pounding." Dr. Marcus then explained that as a corollary, "it's not unusual or unheard of for deaf people to show up at another deaf person's home and actually just walk in." Dr. Marcus also testified that likely as a result of frequent interaction with deaf individuals during his childhood, Woodel "really wouldn't think twice about walking in without knocking" when going to a friend's home. Dr. Marcus did not, however, testify that Woodel habitually walked uninvited and unannounced into the homes of strangers.

Furthermore, Woodel's own penalty phase testimony refuted the theory that due to his upbringing in the deaf community and his intoxication, he mistakenly believed that it was appropriate for him to enter the Moodys' trailer without invitation. Woodel testified that when he first approached the screen porch door of the Moodys' trailer, he "stood there waiting for [Bernice] to . . . turn around and notice me so I could ask her what time it was." Once on the porch, Woodel testified that he heard Bernice tell him to "[g]et out of my trailer" and that when she came to the back door with a knife, he "pushed her back" in order to actually enter the trailer. It would be unreasonable for the jury to conclude from this evidence that Woodel did not know—until it was too late to retreat—that he was unwelcome in the Moodys' trailer.

Second, the postconviction evidence did not establish that Dr. Dee "present[ed] misleading evidence to the jury that psychological testing indicated

- 53 -

that Woodel was psychotic." Dissenting op. at 72. To the contrary, Dr. Dee testified that he could not interpret the Minnesota Multiphasic Personality Inventory (MMPI) given to Woodel because the test results were invalid and repeatedly explained that other testing and his clinical evaluation demonstrated that Woodel was not psychotic or schizophrenic. Dr. Dee testified that he administered an instrument expressly designed to test for psychopathic traits and that Woodel's "score didn't even approach—even get close to the cut-off score of 30 that's necessary [for] psychopathy." Dr. Dee further testified that the invalid results of the MMPI, Woodel's "idiosyncratic" interpretation of items in the psychological testing, and Woodel's hand movements, led Dr. Dee to discover that Woodel's parents were deaf. Accordingly, while Dr. Dee did not know prior to administering the MMPI that the results would likely be invalid due to Woodel's status as a child of deaf parents, Dr. Dee discovered that fact and explained to the jury that Woodel was not psychotic.

Third, while Dr. Marcus testified in more detail about the deaf community and the particular difficulties faced by children of deaf adults (CODAs), Dr. Marcus's explanation of Woodel's experiences as a CODA and the psychological effects of those experiences did not materially differ from Dr. Dee's presentation during the 2004 penalty phase. Dr. Dee testified about the "specific subculture" of hearing children of deaf parents. Dr. Dee explained that through adolescence, such

children generally associate with and identify with deaf individuals and then experience "shock" and "hurt" when they are "progressively excluded from that culture because they have to enter the hearing world." And because the parents do not know what it is like to hear, the parents cannot appreciate the struggles their children experience when transitioning between two worlds. Moreover, Dr. Dee explained that Woodel's "verbalizations [were] often incomplete and almost b[are] in content" but when Woodel signed, "there was a richness of communication and depth of feeling." Dr. Dee opined that as a result of Woodel's experiences as a child, he had "difficulty with abstract concept formation and understanding feelings" but that Woodel nevertheless did, in fact, feel remorse.

Dr. Dee also testified about the social dynamic between deaf parents and hearing children generally and Woodel and his parents specifically. Dr. Dee explained that when Woodel's parents were young, deaf children were generally raised in schools for the deaf—rather than by their parents—and that the administrators of these schools did not use sign language. Children raised in those environments learned that they could not communicate meaningfully with adults and were rarely told why they were being disciplined. As a result, the children looked to each other to solve problems, and once they became parents, this generation expected their children to act as peers and tended to be either very permissive or arbitrarily harsh. Dr. Dee noted that where the children of deaf

parents can hear, there is an additional layer of "pseudoresponsibility and pseudomaturity" thrust upon the children. He explained that because they could hear and speak, Woodel and his sister, like many CODAs, were expected to communicate for their parents, often in developmentally inappropriate situations such as when a parent needed medical care or was questioned by law enforcement officers.

Finally, while Dr. Dee did not himself use sign language to communicate with Woodel, Dr. Dee was able to interview Woodel about his upbringing. In addition to testifying about the struggles Woodel and his siblings faced as CODAs, Dr. Dee testified about other "pernicious factors going on in" Woodel's childhood. Dr. Dee explained that Woodel and his siblings "were frequently abandoned by their parents." Dr. Dee noted that Woodel moved at least twenty-three times before he was fifteen years old—including being left at a children's home for approximately two years—that the siblings would be left with relatives for long periods, and that for days at a time, they would be left with "whomever would take them" or entirely without adult supervision. Dr. Dee explained that such abandonment "leads to terrifying loneliness," "chronic depression," and "low self-esteem." Dr. Dee also testified that Woodel was physically abused on at least one occasion. Further, while Woodel did not report any sexual abuse, Woodel's sister testified that she was sexually abused by one of her mother's boyfriends, and

despite Woodel's denial, Dr. Dee suspected that Woodel might also have been sexually abused. Overall, Dr. Dee opined that Woodel's childhood was "[f]illed with some of the most spectacular neglect and abuse that I think I [have observed] ever."

Based on the foregoing, this is not a case in which "minimal mitigation evidence [was] presented to the jury at Woodel's resentencing" and "other significant mitigation" was overlooked. Dissenting op. at 58, 76. Accordingly, I concur in the majority's conclusion that a new penalty phase is not warranted.

POLSTON, C.J., concurs.

PARIENTE, J., dissenting.

After conducting a lengthy evidentiary hearing and analyzing all of the evidence presented at the hearing in a comprehensive eighty-six-page order, the trial court concluded that a new penalty phase is required because confidence in the sentence of death has been undermined based on trial counsel's troubling failure to properly prepare for the penalty phase and present important available mitigation, even after he was given a second chance when a new penalty phase was previously ordered. I dissent from the Court's rare step of reversing the trial court's determination that its confidence in the death sentence was undermined.

This Court's reversal of the trial court's exceptional grant of postconviction relief is even more troubling in light of the fact that, even with the minimal

mitigation evidence presented to the jury at Woodel's resentencing, the jury recommended a life sentence as to one of the murders and recommended a death sentence for the other murder by the slimmest margin possible—a seven-to-five vote. For the reasons addressed below, after a full assessment of all of the evidence presented at the resentencing, in addition to the newly discovered mitigation evidence presented during postconviction proceedings, in my view, competent, substantial evidence supports the trial court's factual findings that formed the basis for granting a new penalty phase and the trial court did not err when in undertook its legal analysis.

Like the trial court, I conclude that the failure of trial counsel to pursue additional mitigation and perform any additional meaningful investigation prior to Woodel's resentencing undermines confidence in the outcome of the death sentence, which was recommended by a bare majority of the jury. A proper analysis of Woodel's ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668 (1984), demonstrates that Woodel is entitled to a new penalty phase.

In this case, not only does the majority fail to address deficiency at all, but the majority never conducts a full analysis of the Strickland prejudice prong. Specifically, the majority engages in a flawed legal analysis never adopted by this Court, addressing each individual failure to present mitigation evidence in a

vacuum and never analyzing whether counsel's deficiency as a whole operated to undermine confidence in the outcome of the penalty phase. Succinctly stated, when analyzing Strickland prejudice, if the Court finds that counsel was deficient in numerous aspects of his or her performance, the Court cannot simply analyze the prejudice caused by counsel's failure to present each individual piece of evidence alone. Instead, the Court must review whether counsel's deficient performance itself prejudiced the defendant. The majority's piecemeal approach is contrary to the United States Supreme Court's holding in Strickland, as well as this Court's precedent, in which the Court considers the Strickland prejudice prong cumulatively. See, e.g., Simmons v. State, 105 So. 3d 475, 503 (Fla. 2012) (reviewing the claim that counsel failed to properly investigate and failed to present certain mitigation witnesses as a singular claim and reviewing the prejudice from this deficiency on the whole); Robinson v. State, 95 So. 3d 171, 177 (Fla. 2012) (same); Franqui v. State, 59 So. 3d 82, 98 (Fla. 2011) (reviewing Strickland claims individually and cumulatively after determining that counsel may have been deficient in failing to object to multiple prosecutorial comments).

While the majority undertakes a separate cumulative error analysis after erroneously concluding that Woodel's Strickland claim lacks merit, cumulative error is a separate and distinct analysis from analyzing prejudice under Strickland. See, e.g., Brown v. State, 846 So. 2d 1114, 1126 (Fla. 2003) (analyzing cumulative

error separately and holding that a cumulative error claim fails when the defendant fails to establish any of his claims under Strickland). Thus, the cumulative error analysis cannot be substituted for a Strickland prejudice analysis, without conflating a cumulative error analysis with a Strickland prejudice analysis.[16]

For those reasons, I view this case as very similar to the United States Supreme Court's reversal in Sears v. Upton, 130 S. Ct. 3259 (2010), where the Supreme Court held that the state supreme court applied the wrong prejudice analysis when it denied the defendant relief on the basis of counsel's constitutionally inadequate initial mitigation investigation. After emphasizing counsel's inadequate mitigation investigation, the Supreme Court stressed that it had never limited its prejudice inquiry under Strickland to cases in which there was "only little or no mitigation evidence presented." Id. at 3266 (citations omitted). The Supreme Court then stressed that it "categorically rejected the type of truncated prejudice inquiry undertaken by the state court" below and emphasized its holding in Porter v. McCollum, 558 U.S. 30, 33 (2009), in which the Court recently explained:

> "To assess [the] probability [of a different outcome under Strickland], we consider the totality of the available mitigation

---

16. In addition to the flawed legal analysis, the majority conflates deficiency and prejudice. See majority op. at 34-35. The majority also uses a harmless error standard when it should be applying a Strickland prejudice standard. See id. at 24, 29-30.

- 60 -

evidence—both that adduced at trial, and the evidence adduced in the
habeas proceeding—and reweig[h] it against the evidence in
aggravation." 558 U.S., at 41 (internal quotation marks omitted; third
alteration in original).

      That same standard applies—and will necessarily require a
court to "speculate" as to the effect of the new evidence—regardless
of how much or how little mitigation evidence was presented during
the initial penalty phase. Indeed, it is exactly this kind of probing
inquiry that Justice SCALIA now undertakes, post, at 3268–3271, and
that the trial court failed to do. In all circumstances, this is the proper
prejudice standard for evaluating a claim of ineffective representation
in the context of a penalty phase mitigation investigation.

Sears, 130 S. Ct. at 3266-67 (emphasis added) (quoting Porter, 558 U.S. at 41).

Moreover, this flawed analysis in this case may have led the majority to improperly conclude that the prejudice prong of Strickland was not met by looking at the deficiencies and prejudice arising from the individual failures piecemeal rather than as a whole. This type of piecemeal analysis is particularly problematic because the majority addresses only prejudice and never focuses on the numerous deficiencies in trial counsel's failure to follow-up on mitigation before the second trial after requesting a continuance of the original trial to pursue that very mitigation.

Even though defense counsel did present some witnesses who testified during the resentencing as to the abuse that Woodel suffered during his life, one of the primary witnesses counsel relied upon was the abuser himself who attempted to mitigate his own actions. The other witness was Woodel's aunt, who did not have much contact with Woodel.

By contrast, the quality of the witnesses presented at the postconviction evidentiary hearing provided a more complete picture of not only the abuse, but the impact of being a child of deaf parents. Postconviction counsel found numerous witnesses who were willing to testify, all of whom were available to trial counsel if he had just performed a proper investigation. These witnesses included Woodel's half-brother, who also grew up in the same abusive environment and suffered significant addiction problems as an adult; Woodel's uncle, who discussed the inter-generational abuse within the family; witnesses who knew Woodel when they lived at the Children's Home and saw Woodel's desperate attempts to fit into the hearing world; people who interacted with Woodel's parents and interacted with Woodel when he was a child and who could have testified as to the situation that Woodel faced growing up; a mental health counselor who saw Woodel when he was young and thought his parents were unfit to raise children; neighbors and acquaintances who knew Woodel's parents and expressed concern because, based on their limited interactions, they understood that Woodel's parents were unfit to raise children; a psychiatrist who works with the deaf and hard of hearing, as well as with children of deaf adults (CODAs); an expert as to clinical pharmacology, who discussed the effect of alcohol on Woodel at the time of the crime; and a psychologist who testified as to the significant limitations that Dr. Dee had in

attempting to provide his diagnosis during the trial and the second penalty phase based on Dr. Dee's lack of sufficient information.

As addressed in more detail below, I first review the deficiency of Woodel's trial counsel in completely failing to ensure that a full mitigation investigation was undertaken in this case, even though counsel had two attempts in which to act, and second, I review the clear prejudice that this deficiency had on the case.

**DEFICIENCY**

While this Court can properly deny relief if either deficiency or prejudice is lacking, the majority's failure to address counsel's numerous glaring deficiencies, in addition to its piecemeal approach to each subclaim of prejudice, provides an incomplete picture of why a new penalty phase is required. The deficient performance is even more egregious because counsel had a second chance to pursue important investigative leads between the initial and second penalty phases and completely failed to do anything additional during this significant timeframe.

As the trial court pointed out, although the prejudice analysis must focus on the 2004 trial, the deficiency must be seen as starting during the 1998 proceeding. The evidentiary record establishes trial counsel's complete failure to investigate necessary mitigation prior to the start of the first trial, including crucial social history and Woodel's background. Instead, counsel relied solely upon hiring a mental health expert, Dr. Dee, who had not been provided with the necessary

background information.  Dr. Dee himself requested counsel to hire a person who could help him find witnesses to interview as a part of his evaluation.

But it was not until three days <u>after</u> jury selection began during the initial trial that Toni Maloney was appointed to assist in the case as a witness coordinator. However, Maloney was not hired to "perform a thorough mitigation investigation"; she was hired to help put the records together and contact witnesses so that Dr. Dee could interview them as a part of his evaluation.  In locating witnesses for Dr. Dee, Maloney interviewed Woodel at the jail and noticed that Woodel would communicate by attempting to sign and talk at the same time.  During the interview, Maloney discovered that both of Woodel's parents were deaf and informed both counsel and Dr. Dee about this critical development.  Because Maloney was attempting to find necessary information for Dr. Dee after the trial had already commenced, and because she was retained during the same time period as the Thanksgiving holiday, Maloney had a difficult time obtaining all of the information and records that she needed in time for the defense's use at trial. Counsel requested a continuance to pursue additional mitigation, but this request was denied.

One of Woodel's trial attorneys admitted during the postconviction evidentiary hearing that he did not realize that both of Woodel's parents were deaf until the trial had commenced.  Defense counsel did not recall interviewing

Woodel's father until after the trial began and never found Woodel's mother, although counsel also did not hire an investigator. At the initial penalty phase, counsel called Dr. Dee, a few people who knew Woodel at the time of the crime, and three of Woodel's family members: Woodel's father, sister, and aunt. However, at trial, Woodel's father testified in an inconsistent manner from his prior statements to Dr. Dee, and because a proper background investigation was never conducted, the defense did not have adequate information to respond.

After the initial penalty phase, the jury recommended a sentence of death for both murders, which the trial court imposed. However, because the trial court failed to provide an adequate sentencing order, this Court reversed for a new penalty phase. Woodel v. State, 804 So. 2d 316, 327 (Fla. 2001). Probably most tellingly as to the degree of deficient performance during the resentencing, although trial counsel was aware of the significant amount of mitigation investigation that was necessary, after a new penalty phase was required, counsel failed to follow up at all—even though counsel had previously recognized in 1998 that additional time to discover mitigation was essential and for that reason had requested a continuance.

Specifically, counsel failed to request that Maloney, or any other individual, finish the investigation that began in 1998. Instead, trial counsel simply proceeded with the same information gleaned from the original trial. As the trial court stated:

In preparation for the second penalty phase, Mr. Colon talked to three family members, Bobbie Hermes, Albert Woodel and Margaret Russell. The same three people that testified at the 1998 trial. He did not go to North Carolina or Michigan and he did not hire an investigator to do so. All he did was review records and proceed with the same type of defense. He did not hire Toni Maloney, or for that matter, any mitigation specialist to talk to family members and other potential witnesses. He acknowledged on redirect that it may have been a bad decision. He did no additional investigation or try to find a CODA expert. Mr. Colon said "looking back, I wish I had hired somebody that would have come in and provided further testimony." Mr. Colon was on notice that he had unique issues regarding his client.

While this Court does not engage in 20/20 hindsight or second-guess strategic decisions, to reach the conclusion that trial counsel was seriously deficient, the Court needs only to look at what trial counsel himself told the trial court in 1998 as to the further necessary investigation, when counsel requested a continuance in order to pursue the additional mitigation sought by Dr. Dee and Maloney. Moreover, the failure to properly investigate can never be considered a strategic decision. See Wiggins v. Smith, 539 U.S. 510, 522 (2003) (explaining that "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background' " (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000) (alteration in original))). In fact, as recognized by the United States Supreme Court, when counsel "conduct[s] a constitutionally deficient mitigation investigation . . . , at the

very least, [this] call[s] into question the reasonableness of [counsel's] theory." Sears, 130 S. Ct. at 3265.

Maloney testified at the evidentiary hearing, detailing the considerable additional investigation that she normally would have conducted had she not been constrained by the significant time limitations during the original trial. Maloney, who served as a mitigation specialist in a number of prior cases, was familiar with the substantial amount of work required to investigate and prepare for a penalty phase, stating that she usually had almost a year to investigate a capital defendant's background and history when she was hired as a mitigation investigator. In this case, she was hired as support during the few weeks while the trial progressed. She testified that when she learned that both of Woodel's parents were deaf, she was "frantic . . . to try to understand that particular issue and the dynamics of it" but had very little time. She found a book on the matter, which she gave to Dr. Dee. If she had been appointed to perform a mitigation investigation with sufficient time, however, she testified that she would have contacted Thomas Kerwin, a mental health expert that Woodel saw as a child; contacted people who worked at the Children's Home where Woodel lived for years as a child; visited the areas where Woodel grew up; and contacted people in the deaf community.

In addition, attorney Robert Norgard testified as an expert on prevailing professional norms among capital defense attorneys. While he was troubled by

many things that occurred in this case, Norgard was particularly bothered by the fact that Woodel's trial counsel did not realize that Woodel's parents were both deaf until well into the guilt phase of the trial, as this would have been apparent if counsel had interviewed the parents prior to trial. As he testified, "[That is] the part that just really boggles my mind about the whole situation is that a basic penalty phase investigation would start with the parents. And the first contact with the parents you would have known they were deaf, whether your client told you or not, so. I mean, that's the part that, you know, surprises me about the late discovery of it." The trial court detailed the numerous problems that Norgard discussed, including the amount of research defense counsel failed to undertake before determining whether to present expert testimony concerning a voluntary intoxication defense, evidence concerning addiction and its genetic components in this case, and the complete lack of additional preparation when a new penalty phase was ordered.

Trial counsel himself recognized that although he was responsible for investigating all possible mitigation, he never spoke with numerous members of Woodel's family, including Woodel's mother, half-brother, or childhood friends. In addition, trial counsel recognized that he did not retain a mitigation investigator to help prepare for the second penalty phase or perform additional investigation, even though counsel had previously recognized that additional time and

investigation were necessary. Trial counsel explained his decision not to investigate all available mitigation as follows: "I didn't feel that it was necessary based on the package I was presenting. And, as I said before, looking back now, that may have been a very bad idea."

The trial court detailed the numerous deficiencies, and based on the record in this case, there can be no question of counsel's deficient performance. The inquiry then turns to whether prejudice has been demonstrated such that our confidence in the sentence of death has been undermined, as the trial court found.

**PREJUDICE**

Numerous witnesses testified at the postconviction evidentiary hearing in great detail as to the abuse that Woodel suffered and the additional mitigation available. While there was discussion of abuse in the second penalty phase proceeding, the quality of the witnesses who were called at the postconviction evidentiary hearing provided a more complete picture of not only the abuse, but the impact of being a child of deaf parents. Although Woodel's trial counsel simply chose not to fully investigate the available mitigation because he was content with the witnesses that he found, failing to investigate and failing to present the lay testimony at issue can never be considered a strategic decision of counsel. Moreover, while trial counsel did not believe that it was necessary to introduce a toxicologist to assist in explaining voluntary intoxication, in describing why he did

not investigate whether an expert on the deaf culture would have been helpful, trial counsel again dismissed the need to seek out such information because he "felt comfortable with the package" he was presenting to the jury.

Thus, the issue before this Court does not involve a scenario where counsel failed to present certain evidence because it would open the door to the admission of unfavorable evidence or evidence that would damage a defense. Instead, counsel made an unreasonable decision to not conduct any additional investigation that would have uncovered other important mitigation witnesses who could have been very helpful to the defense.

During postconviction proceedings, Woodel presented the testimony of Dr. Alan Marcus, a clinical psychologist who works with the deaf and with children of deaf parents and who is also a child of deaf parents. Dr. Marcus noted the limitations of the testimony presented by Dr. Dee at the resentencing since Dr. Dee had no prior experience working with children of deaf parents and his sole preparation for testifying in the case was to review the book Mother/Father Deaf, which is a scholarly, anthropological study, as opposed to a psychological review. Dr. Marcus's testimony, if it had been presented, would have provided the jury a completely different picture of how the crime occurred and substantially increased the mitigation available to the finder of fact—in particular as to four critical aspects.

First, and perhaps most importantly, because Dr. Marcus was familiar with the deaf community and culture, he was able to provide a possible explanation as to how this baffling crime transpired—testifying that the murder may have occurred after an escalation stemming from an initial misunderstanding that was based on the fact that Woodel still acted like a member of the deaf community. Specifically, Dr. Marcus thoroughly explained the importance of socialization for those in the deaf community and how it was common in the deaf community for people to leave their front doors unlocked so they would not miss the arrival of visitors. Likewise, it was not contrary to societal norms for members of the deaf community to walk into each other's homes, unannounced.

Here, the murder happened after a very intoxicated Woodel walked into the victims' home to inquire as to the time. Woodel saw that Bernice Moody was awake when she was cleaning, and he knocked on the door. When she did not answer, Woodel thought she could not hear his knock and walked in. Woodel's statements describing how he first approached the victim were difficult to follow as he contradicted himself, giving three different accounts as to where he was located when Bernice first saw him: he was at the door that went into her bedroom, he was not inside yet, and he was on the porch. When he was questioned further as to where he was when Bernice first saw him, he stated that he could not remember and was unsure. He testified that when Bernice saw him, she took a few steps

away, picked up a knife, and swung it at him as she yelled. Woodel attempted to explain why he was there, as she yelled and swung the knife. On the third swing, Woodel pushed her backwards and somehow acquired the knife, although he could not recall how. According to his statement, Woodel thought at the time that she was trying to cut him. Taking Dr. Marcus's insight together with Woodel's intoxication and his upbringing where it was permissible to walk into each other's homes, the defense could have argued that Woodel did not realize his error in entering her house and thought the victim was threatening him.

Second, and important to the quality of the mitigation presented, because Dr. Dee was unfamiliar with the deaf community, he utilized the incorrect psychological testing, thus presenting misleading evidence to the jury that psychological testing indicated that Woodel was psychotic. Before addressing the testing itself, Dr. Marcus explained how English is a second language to a child of deaf parents, with sign language being his or her primary language. Further, Dr. Marcus noted that even Dr. Dee recognized Woodel's difficulties in being able to fully express himself orally in English. Dr. Marcus explained critical differences between the English oral language and American Sign Language, stressing that a person cannot simply translate the English language into American Sign Language because American Sign Language is visually driven, while the English language is sound driven.

As to the administration of psychological testing, including the Minnesota Multiphasic Inventory (MMPI), Dr. Marcus testified that it is widely recognized that the MMPI is inappropriate for deaf people or children of deaf parents because there are too many concepts and terminologies that are misunderstood in the translation, which skews the results. However, the test had never truly been translated into American Sign Language because of the difficulty in translating some of the questions and concepts that are sound based. Based on these problems and the skewed results, as Dr. Marcus directly stated, "They come out looking crazy in simple terms." However, Dr. Dee administered this test to Woodel, testifying to the jury that when he administered the MMPI to Woodel, the test results indicated that Woodel was psychotic. Although Dr. Dee questioned this result, he did not realize that the MMPI was inappropriate, and merely expressed his concerns that the results of the MMPI must have been flawed for some reason, but was unable to provide an explanation for this result to the jury.

Third, Dr. Marcus interviewed Woodel in sign language, which was incredibly important in light of the apparent difficulties that Woodel had in fully expressing himself verbally. Although Dr. Dee recognized that Woodel was not fully stating his thoughts and opinions verbally as he used both sign language and oral responses, Dr. Dee attempted to remedy this problem by asking Woodel what he was signing. Yet, Dr. Dee also recognized that Woodel's interpretation of

- 73 -

words and his use of language were so odd that as to certain discussions, Dr. Dee "couldn't make any sense out of what [Woodel] was trying to tell me." However, neither Dr. Dee nor Woodel's counsel ever obtained an interpreter to assist in the communication problems. In interviewing Woodel in sign language, Dr. Marcus was able to provide significantly more details about the impact of Woodel's upbringing on his life and how the abandonment from his parents and the exclusion from the deaf community affected him. In addition, because Dr. Marcus was a child of deaf parents himself, he was able to provide a detailed picture about the culture of the deaf community and other relevant factors.

Finally, having personal familiarity with being a child of deaf parents, Dr. Marcus was able to provide a fuller picture of the relationship between deaf parents and hearing children and the subsequent rejection of older hearing children from the deaf community. Generally, when deaf adults have infants, there is not much separation between parent and child. However, once a child is able to communicate with the hearing world, he or she would be expected to become an adult for his parents, despite the child's very young age.

Many children of deaf parents are forced to help their parents navigate through the hearing world, including helping them obtain Social Security benefits or helping them to deflect any possible trouble with the law. For example, if the child is being required to intervene when his or her parents are involved with a

police officer, the child would not tell the officer the truth, but would protect his or her parents. Thus, the families do not obtain the help they need. If a police officer were to encounter a child who was abandoned at the mall by a parent, like the situation that occurred to Woodel, the child would not tell the officer the truth, but would lie for the parent and say that he or she simply got lost.

Despite this close attachment to the deaf community as a child, however, based on the mistrust of the hearing world, as a hearing child gets older, he or she could end up being excluded from the deaf world. Thus, children of deaf parents often feel they have no place where they belong. In Woodel's case, he was abandoned by both his family and the deaf community, which was the society in which he grew up. For Woodel and his sister, being a part of the deaf world was a part of their identity. Woodel and his sister tried to sign at the Children's Home in order to keep their identity as a part of the deaf world, but they were punished because others thought that they were keeping secrets.

Not only did postconviction counsel present evidence at the evidentiary hearing as to this important factor, but counsel also presented other significant mitigation, including that all of Woodel's siblings, including his two half-brothers, had significant addiction problems; that Woodel's parents had serious addiction and physical abuse problems; and that Woodel's half-brother had been raped by his mother's boyfriends, just like his sister had been—evidence that was important for

the jury to hear because Woodel testified that he was unable to recall that period of his life and whether he had been raped.

Woodel also called Dr. Mark Cunningham, who testified that based on the numerous damaging developmental factors, the family history, the generational abuse, and the dysfunctions to which Woodel was exposed, this was one of the worst cases that he had encountered, and the lack of a proper mitigation investigation prior to the trial affected Dr. Dee's ability to perform an adequate assessment. Specifically, Dr. Cunningham discussed the significant hereditary and genetic predispositions that impacted Woodel—Woodel had significant damaging developmental factors as he grew up, including being uprooted and moved at least twenty-seven times by the time Woodel was in middle childhood; Woodel suffered from deficient and disrupted attachment, emotional and physical neglect, probable sexual abuse, abandonment, and rejections and failures; and significant parental drinking and abuse. According to Dr. Cunningham, without this crucial information, the jury was left with a simple impression that Woodel's life should be spared because he had a bad childhood, but the jury was never provided with over thirty well-articulated damaging developmental factors that impacted Woodel and the generational abuse within his family that would have provided necessary information to show the significance of the mitigation and how it impacted him.

On too many occasions, this Court has addressed cases in which counsel failed to conduct a mitigation investigation until trial began—conduct that is clearly deficient and will have a significant impact on the case. See, e.g., Blackwood v. State, 946 So. 2d 960, 973 (Fla. 2006) (affirming the trial court's decision to grant a new penalty phase where counsel attempted to secure a mental health evaluation five weeks prior to trial but did not take sufficient actions when the expert declined to provide an evaluation shortly prior to trial based on a fee dispute, even though counsel then secured additional mental health mitigation at the Spencer hearing); State v. Coney, 845 So. 2d 120, 129-133 (Fla. 2003) (affirming the trial court's decision to grant a new penalty phase where counsel attempted to secure mental health evaluations after the guilt phase and failed to adequately prepare); State v. Lewis, 838 So. 2d 1102, 1112 (Fla. 2002) (same); Deaton v. Dugger, 635 So. 2d 4, 8 (Fla. 1993) (requiring a new penalty phase where trial counsel failed to investigate mitigation evidence prior to trial, resulting in his client waiving the presentation of mitigation altogether). Here, trial counsel likewise failed to conduct the mitigation investigation in a timely manner, and upon being given a second chance when a new penalty phase was ordered, made the unreasonable decision to not undertake any additional investigation because he decided he could simply rely on the testimony previously presented at the initial penalty phase.

During postconviction proceedings, however, current counsel discovered significant additional mitigation, some of which changes the very nature of the crime, and clearly could have impacted the jury's bare majority seven-to-five recommendation. The bottom line is that trial counsel chose not to undertake a full mitigation investigation, which would have uncovered other important mitigation witnesses who were far more compelling than the witnesses that trial counsel utilized during the second penalty phase, who were simply recycled without any additional thought or analysis.

Accordingly, the failure to present the considerable mitigation that existed but was never pursued, due to the deficiencies of trial counsel, results in prejudice such that confidence in the outcome has been undermined. The trial court considered all of this evidence, asked careful and thoughtful questions throughout the evidentiary hearing, and analyzed all of the relevant information in an extensive eighty-six-page order. Based on the analysis above, I would affirm the trial court's decision to grant a new penalty phase.

An Appeal from the Circuit Court in and for Polk County,
        J. Michael Hunter, Judge - Case No. 53-1997-CF-000047-AO

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida,

        for Appellant/Cross-Appellee

Marie-Louise Samuels Parmer and Maria E. Deliberato, Assistant Capital Collateral Regional Counsels, Middle Region, Tampa, Florida,

for Appellee/Cross-Appellant